**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| ADAPTIX, INC., <br><br> Plaintiff, <br> v. <br><br> ALCATEL-LUCENT USA, INC. and AT&T MOBILITY LLC, <br><br> Defendants. | Civil Action 6:12-cv-00022 (MHS-CMC) <br><br> JURY TRIAL DEMANDED |
| ADAPTIX, INC., <br> Plaintiff, <br> v. <br><br> ALCATEL-LUCENT USA, INC. and CELLCO PARTNERSHIP *d/b/a* VERIZON WIRELESS, <br><br> Defendants. | Civil Action No. 6:12-cv-00122 (MHS-CMC) <br><br> JURY TRIAL DEMANDED |
| ADAPTIX, INC., <br> Plaintiff, <br> v. <br><br> ALCATEL-LUCENT USA, INC. and SPRINT SPECTRUM L.P., <br><br> Defendants. | Civil Action No. 6:12-cv-00123 (MHS-CMC) <br><br> JURY TRIAL DEMANDED |

**PLAINTIFF'S MOTION TO COMPEL SOURCE CODE**

06062355

# TABLE OF CONTENTS

I.   BACKGROUND ...............................................................................................................1

    A.   NOTICE OF CODE REVIEW ...........................................................................3

        1.   The First Attempted Source Code Review ..................................................4

        2.   The Second Attempted Source Code Review .............................................6

III. ARGUMENT.....................................................................................................................7

IV.  CONCLUSION................................................................................................................11

## TABLE OF AUTHORITIES

**CASES**

*Edward D. Ioli Trust v. Avigilon Corp.*
  2012 WL 5830711 (E.D. Tex. Nov. 16, 2012) ............................................................7, 8, 9

**RULES**

F̲ED̲. R̲. C̲IV̲. P. 37 ..................................................................................................................1

P. R. 3-4..........................................................................................................................7, 8, 9

Plaintiff, Adaptix, Inc. ("Adaptix"), hereby moves for an Order, pursuant to Federal Rule of Civil Procedure 37(a)(1), compelling Defendant, Alcatel-Lucent USA, Inc. ("ALU"), to immediately make available for inspection **all** source code related to the accused products identified long ago by Adaptix.

I.  **BACKGROUND**

Adaptix has requested ALU repeatedly since February 3, 2014 to review **all** of its source code for the accused ALU base station products.[1]  To understand the functionality of the accused products, Adaptix needs to understand the ALU code which, as the Court knows well, is the human readable instructions that define the functionality of the products. Jones Decl., ¶ 5.

Source code reviews are not trivial undertakings.  Typically, source code for telecommunications equipment, such as the ALU base stations, can run into the many thousands of "files," or many millions of lines of source code.  This is analogous to document discovery, which can also run into the many thousands of documents, or many millions of sentences.  Jones Decl., ¶ 6.  Source code can be written in various languages. This again can be viewed as analogous to document production, whereby documents can be produced in different formats (for example, paper documents for binding into books or manuals, or computer-readable formats such a Microsoft Word or PDF files for viewing on a computer or e-book).  *Id*., ¶ 7.  Source code is usually highly modularized.  Each module performs a specific function for the accused product.  Modules typically consist of header

---

[1] The accused ALU base station products are as follows:  9100 Multistandard Base Station; 9412 eNodeB Compact; 9460 Pico (a/k/a p426 Pico); 9926 Distributed Base Station; 9442 Remote Radio Head; lightRadio 9711 Indoor Base Station for LTE; lightRadio 9712 Outdoor Base Station for LTE; and 9760 Small Cells, including 9764 Metro Cell Outdoor LTE and 9768 Metro Radio Outdoor, as set forth in Adaptix's Infringement Contentions.  Declaration of Nigel Jones ("Nigel Decl."), ¶ 10.  For convenience and comprehensiveness, the Nigel Decl. makes reference to exhibits from the Declaration of Adaptix Counsel Steven Lipman ("Lipman Decl.").

files and code files.  Header files are analogous to a table of contents and glossary in a document.  Code files contain the actual instructions which are analogous to the text of a document.  The various modules are interrelated.  To understand the functionality of one module, it is necessary to understand the interconnected modules upon which the module relies.  *Id*., ¶ 8.  A full and complete production of source code by ALU is necessary to properly understand the full functioning of the accused products.  Any omission of source code files from this production will hamper (and has hampered) the understanding of the operation of the products, or hide accused functionality.  *Id*., ¶ 9.

To perform this source code review, Adaptix has also requested certain fundamental equipment to enable an efficient and effective review of the ALU source code.  This basic equipment included:

- A computer containing all of the ALU source code;
- A screen size bigger than 17", preferably as an external monitor to the computer; and
- Certain *software* "tools" to enable efficient review and analysis of the source code.

Jones Decl., ¶ 11.  The requested tools are reasonable and standard equipment for such a source code review.  For example, the use of a screen larger than 17" is necessary to enable proper review of source code which may include, for example, opening multiple viewing windows to enable side-by-side comparison of different files, or to be able to view multiple lines of source code within big file structures.  Furthermore, given the fact that the source code computer is often a laptop computer with a correspondingly small screen, the typically one-week code review, involving extensive time viewing complex software on the screen, often by more than one code viewer, requires a larger monitor for proper ergonomics and health and safety purposes.  *Id*., ¶ 12.  Furthermore, Adaptix requested that several software

tools be installed on the source code computer. These tools included the following software programs: "Eclipse," "Understand," and "Beyond Compare."[2] In this regard, Adaptix stipulated that for any such software tools that are not freely available, Adaptix would pay for them. *Id*., ¶ 13.

The use of these software tools is analogous to the use of search tools in document discovery. For example, document discovery can amount to many, many thousands of pages, of many, many millions of words. To find items of interest, search tools are used to scan through these documents, index them, and provide easier access to the content. For documents produced in one format (for example, Microsoft Word), certain search tools are used (for example, the "find" command within Microsoft Word). However, this tool may only work within one document, so another tool is required to search through all documents (for example, across multiple Microsoft Word documents). Furthermore, this tool may not work for similar documents produced in a different format (for example, a Word search tool cannot search through PDF documents). In addition, some programs allow two different documents to be viewed and compared alongside one another, to compare and contrast different revisions of documents. Without such tools, analysis of document comparison would be tedious, slow, and cumbersome. Jones Decl., ¶ 14.

### A. NOTICE OF CODE REVIEW

On February 3, 2014, Adaptix advised ALU that Adaptix intended to commence review of ALU's source code – Adaptix's request was denied by ALU for at least three weeks. Lipman Decl., Exs. 4 through 15; Jones Decl., ¶ 15.

---

[2] "Eclipse" is a software program that displays code in a readable format and allows navigation between related files. "Understand" is a program that builds a database of the files provided and gives metrics on how the code is architected. It also provides a list of missing files. "Beyond Compare" is a program that compares files and directory structures to one another. *Id*., ¶ 13.

## 1. THE FIRST ATTEMPTED SOURCE CODE REVIEW

Eventually, a one week review of ALU source code was *arranged* at the Chicago offices of ALU's counsel from Monday, March 3rd through Friday, March 7, 2014. Lipman Decl., Ex. 16; Jones Decl., ¶ 16. On March 3rd Adaptix's outside source code reviewers arrived in Chicago to perform the review. However, the following events occurred:

   a. The requested software tools (for example, "Eclipse," "Understand," and "Beyond Compare") were not installed on the source code computer;

   b. The produced source code was substantially incomplete. For example, there was less than 200 source code files provided per customer base. This was *much fewer* than the many thousands expected. Review of these few files showed that the files referenced many further files which were simply missing. In addition, none of the source code for the important FPGA's[3] was provided;

   c. A large monitor was provided for proper viewing of the source code; and

   d. ALU's "monitor" counsel present at the March 3rd review was advised verbally by the on-site reviewers of at least the two deficiencies noted above, that prohibited Adaptix from properly reviewing ALU source code. In addition, a list of identified missing files was given by hand to ALU's counsel present at the review. This list was not meant to be exhaustive; it was meant to provide a list illustrative of the missing files.

*Id*., Decl., Ex. 17; *Id*., ¶ 17.

On the next day, the Adaptix source code reviewers returned to continue the review when the following took place:

   a. Two of the three requested software tools had been installed;

   b. One of these tools allowed a list of known missing files to be compiled. The list included over 200 files that were referenced by the produced files, but were missing from the production. (It is important to note that this list represents the *minimum* number of missing files, since it is normal for missing

---

[3] A **F**ield-**P**rogrammable **G**ate **A**rray (FPGA) is an integrated circuit designed to be configured by a customer or a designer after manufacturing — hence "field-programmable." The FPGA configuration is generally specified using a **H**ardware **D**escription **L**anguage (HDL), similar to that used for an **A**pplication-**S**pecific **I**ntegrated **C**ircuit (ASIC) (circuit diagrams were used previously to specify the configuration, as they were for ASICs, but this is increasingly rare). *See* http://en.wikipedia.org/wiki/Field-programmable_gate_array for this relatively simple explanation.

      files to in turn reference other files that are missing.).  Given that there was less than 200 files produced, at the very most, less than half of the source code was produced by ALU;

c.  The large external monitor was removed during the day, leaving the reviewers to review the software together on a small laptop screen; and

d.  Again, ALU's "monitoring" counsel was advised verbally by the Adaptix reviewers of at least the three deficiencies noted above, that prohibited Adaptix from properly reviewing ALU source code.

Lipman Decl., Ex. 18; Jones Decl., ¶ 18.

On March 5th the source code reviewers reported the following:

a.  The software tool "Beyond Compare" had still not been loaded on the source code computer;

b.  The at least 200 referenced-but-missing files still had not been produced;

c.  The external monitor for viewing the files was still not made available; and

d.  Again, ALU's "monitor" counsel was advised verbally by the Adaptix reviewers of at least the three deficiencies noted above, that prohibited Adaptix from properly reviewing the source code.

Jones Decl., ¶ 19.  And, on March 6th:

a.  The software tool "Beyond Compare" had still not been loaded on the source code computer;

b.  The at least 200 referenced-but-missing files still had not been produced; and

c.  The external monitor for viewing the files was still not made available.

*Id.*, ¶ 20.

Given that (i) a majority of the ALU source code files were not made available, (ii) the minority of files made available did not enable understanding of the operation and functionality of the nine accused ALU products, and (iii) the reviewing setup was not conducive for efficient or effective review of the minority of files produced, the source code

inspection was terminated one-day early with little or any substantive advancement in the inspection.  Jones Decl., ¶ 21.

### 2. THE SECOND ATTEMPTED SOURCE CODE REVIEW

A second, longer ALU source code inspection was planned for Chicago from Wednesday, March 19th through Friday, March 28th.  Lipman Decl., Ex. 19; Jones Decl., ¶ 22.  Late in the day on March 18th, ALU's counsel confirmed by e-mail that the full production of ALU source code would be available for review the following day ("[W]e **just received the requested highly confidential source code from our client** and Adaptix may inspect this code beginning on March 19").  *Id*., Ex. 20; *Id*., ¶ 23 (emphasis added).  On March 19th, ALU's counsel advised by e-mail that the full production of source code would be delayed until noon the following day.  *Id*., Exs. 21 through 24; *Id*., ¶ 24.

On March 20th the Adaptix source code reviewer at the inspection reported the following:

    a. The software tool "Beyond Compare" had still not been loaded on the source code computer; and

    b. The external monitor for viewing the files was still not made available.

*Id*., Ex. 25; *Id*., ¶ 25.

Despite these previously reported deficiencies, which still had not been cured, the Adaptix source code reviewer reported that the new code inspection revealed the following:

    a. Some new ALU source code was provided;

    b. Additionally, some compressed files were provided (analogous to when files are "zipped" together to compress and save space).  But, no decompression tool was provided on the source code computer, so the code could not be decompressed – and as a result this code could not be adequately reviewed;

    c. Despite decompression being a relative quick and trivial task, it took multiple verbal requests to ALU's "monitor" counsel's staff and several elapsed hours

>   of negotiation to have the files uncompressed into a readable and useful format; and
>
>   d. When uncompressed, the directories produced contained a large number of "header files" (essentially the definitional files alluded to in Section I, *supra*.). However, the source code subdirectories, where one would expect to find the computational algorithms that perform the actual implemented functionality, were *empty*. Thus, once again, the majority of the requested ALU source code was not produced, and no understanding of the asserted nine products could be (or was) ascertained.

Jones Decl., ¶ 26. Given that a majority of the ALU source code files was not made available, and the inspection setup was not conducive for efficient and effective review of the minority of the files produced, travel plans for Adaptix's code reviewers were cancelled and the second source code inspection was terminated six days early. *Id.*, ¶ 27.

## II. ARGUMENT

The Eastern District's Patent Rule 3-4(a) requires an alleged infringer to produce any and all documents describing the operation of any aspects or elements of an accused instrumentality, and the Rule "clearly covers source code, regardless of what additional materials may exist to disclose the functionality of the technology at issue." *Edward D. Ioli Trust v. Avigilon Corp.*, 2012 WL 5830711, at *3 (E.D. Tex. Nov. 16, 2012); *see also* P. R. 3-4(a) (alleged infringer must make available source code or other documentation showing operation of "any aspects or elements" of accused instrumentality). Unlike other forms of discovery which require a formal request by the opposing party, the patent local rules make it the responsibility of the party itself to make disclosure that satisfy the Rules. *Ioli Trust*, 2012 WL 5830711, at *3.

Nevertheless, for *seven weeks* from Adaptix's February 3, 2014 initial notice to ALU of its intention to commence its source code inspection until at least March 20, 2014 when Adaptix hoped to finish the inspection -- including Adaptix's first (March 3rd through March 6th) and second (March 19th through March 28th ) start-and-stop inspections, *supra*. – ALU did *not*

produce all source code of the operation of the aspects or elements of the *nine* ALU accused instrumentalities, and thus did *not* comply with Patent Rule 3-4(a) by "clearly covering source code, regardless of what additional materials may exist to disclose the functionality of the technology at issue." *Ioli Trust*; Lipman Decl., Ex. 4 through 5; Jones Decl., ¶¶ 15-27.

In fact and according to Adaptix's *principal source code expert*, Mr. Nigel Jones, and his other code colleagues who were acting under his direct supervision and control:

    for the *first inspection*:

        (i) the majority of the ALU source code files were not made available to Adaptix;

        (ii) the minority of files made available to Adaptix did not enable understanding of the operation or functionality of the accused ALU products; and

        (iii) the first inspection setup was not conducive for efficient or effective review of the minority of files produced; and

        (iv) the first inspection was terminated one-day early with little or any substantive advancement in the inspection (Jones Decl., ¶ 21); and

    for the *second inspection*:

        (v) the majority of the ALU source code files was not made available to Adaptix; and

        (vi) the second inspection setup was not conducive for efficient and effective review of the minority of the files produced; and

        (vii) the second inspection was terminated six days early (*Id.*, ¶ 27).

Stated more directly, after the two inspections:

        (viii) only a small minority of the requested ALU source code files had been made available to Adaptix for review (which is critical to enable understanding of the operation and functionality of the accused products) (*Id.*, ¶ 10);

        (ix) not all of the software tools reasonably requested and paid for by Adaptix had been installed on the source code computer;

(x) the viewing ergonomics requested had not been adequately satisfied (*Id*., ¶ 28); and

(xii) Adaptix's source code experts could not even discern whether the ALU Souce code files "clearly cover[ed] source code, regardless of what additional materials may exist [that would] disclose the functionality of the technology at issue" (*Ioli Trust*).

Among the excuses for these fatal deficiencies and the prolonged delays experienced by Adaptix, ALU has taken the position that, despite the detailed and contemporaneous written explanations provided by Adaptix (*see generally* the Jones and Lipman Declarations), ALU has stated, among other things, that it was "unclear why the protective order would dictate that ALU collect and produce non-relevant source code, as it seem[ed to ALU that Adaptix is] suggesting." Lipman Decl., Ex. 18; *see also Id*., Ex. 31. Adaptix never took that position or even stated in any way that it expected ALU to produce "non-relevant source code." To the contrary, Adaptix made clear why ALU's counter-position was "without legal support" *citing Idoli Trust* and P.R. 3-4(a). *Id*., Ex. 19.

With an eye on the fast-approaching fact discovery deadline and being "seriously prejudiced … from having [in]sufficient time to [inspect ALU's] Source Code to enable Adaptix to meet the [original] **April 23, 2014 deadline for Adaptix's Expert Reports**" (*see, e.g.*, Lipman Decl., Ex. 11 (dated February 21, 2014) (emphasis in the original)), Adaptix had no reasonable option but to move the Court on February 26th to "Modify the Court's Scheduling and Discovery Order" (Docket Entry Nos. 142, 132, 117). Obviously, despite the filing of this Modification motion, Adaptix continued its efforts to inspect all ALU source code and, if so, to timely complete its infringement report that would hopefully flow from the continued inspection regardless of the Modification motion. Case 6:12-cv-00022-MHS-CMC, Docket Entry No. 153.

After the second inspection and its follow-up communications to and from ALU (Lipman Decl., Exs.17, 18, 25), Adaptix requested a telephonic Meet-and-Confer on March 24th for a "Motion to Compel … for production of ALU Source Code" (*Id*., Ex. 26). Rather than address the specific, multiple, and varied deficiencies confronted by Adaptix's source code review, ALU failed to respond substantively thereto. *Id*., Ex. 29. The following exemplary comment by ALU is quite revealing on this point: "I don't know what source code you think is missing and which 'empty folders' indicate to you that ALU has failed to produce any files" (*Id*., Ex. 29), especially when compared to what Adaptix had actually reported in writing to ALU -- "[w]hen the files were uncompressed … the source code subdirectories were EMPTY" (*Id*., Ex. 25) (capitalization in the original). More precisely, Adaptix's source code experts made their views clear in the following words: "Given that a majority of the ALU source code files were not made available [at the second inspection], and the reviewing setup was not conducive for efficient review of the minority of the files produced, the second source code review was terminated six days early." *Id*., Ex. 27. And, given even another chance to provide all available source code or other documentation showing operation of "any aspects or elements" of the nine accused instrumentalities to rebut Adaptix's code reviewers' conclusion that "a majority of the ALU source code files were not made available" at the second inspection," ALU just provided more questions and more finger-pointing; and no substance. *Id*., Ex. 31.

The fact that the Court granted Adaptix's February 26th motion to "Modify the Court's Scheduling and Discovery Order" on March 28th is certainly helpful to and appreciated by Adaptix [*see, e.g.*, "Order" (Case 6:12-cv-00022-MHS-CMC, Docket Entry No. 153)], but still without all available source code or other documentation showing the

operation and functionality of "any aspects or elements" of the nine accused instrumentalities, as required by the Court's rules and jurisprudence, render the March 28th Order far short of its reach and seriously prejudice Adaptix's lawful rights. Further, Adaptix will be in no better a position now with the "Order" in its back pocket if ALU's source code discovery / inspection conduct continues failing to (i) answer and remedy Adaptix's specific, multiple, and varied deficiencies without producing all ALU code for all of ALU's nine accused instrumentalities without those deficiencies, and (ii) avoid another lost two+ months, further waste of multiple tens-of-thousands of dollars on expert fees and related expenses, another knock-on-the-Court's-front-door by Adaptix for further relief, and ultimately sanctions and other wasteful motions practice.

### III.  CONCLUSION

For the foregoing reasons, Adaptix respectfully requests that the Court grant Adaptix's Motion to Compel Source Code by ordering ALU to make available immediately for inspection all ALU source code and other documentation showing the full operation and functionality of "any aspects or elements" of the nine accused instrumentalities at issue, and to do so in an

**THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK**

efficient and effective way.

Dated: April 1, 2014

/s/      *Paul J. Hayes*  /
Paul J. Hayes
Steven E. Lipman
Thomas R. Fulford
**HAYES MESSINA GILMAN & HAYES LLC**
200 State Street, 6th Floor
Boston, MA 02109
Tel: (617) 439-4200
Fax: (617) 443-1999
Email: phayes@hayesmessina.com
Email: slipman@hayesmessina.com
Email: tfulford@hayesmessina.com


Craig Tadlock
Texas State Bar No. 00791766
Keith Smiley
Texas State Bar No. 24067869
**TADLOCK LAW FIRM PLLC**
2701 Dallas Parkway, Suite 360
Plano, Texas 75093
Tel: (903) 730-6789
Email: craig@tadlocklawfirm.com
Email: keith@tadlocklawfirm.com

**ATTORNEYS FOR PLAINTIFF ADAPTIX, INC.**


## CERTIFICATE OF CONFERENCE

I hereby certify that counsel for Adaptix has complied with the meet and confer requirement in Local Rule CV-7(h) and that the accompanying motion is opposed. I further certify that counsel for Adaptix conducted a personal teleconference on March 31, 2014 with lead and local counsel for ALU, including Stephen Swedlowe, Marc Kaplan, and Allen Gardner and with lead and local counsel for Adaptix, including Paul Hayes, Steven Lipman, and Craig Tadlock, in an attempt to reach an agreement regarding ALU's failure to produce all of its source code relating to the operation and functionality of the nine accused ALU instrumentalities.

/s/ *Paul J. Hayes*
Paul J. Hayes

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was filed electronically in compliance with the Local Rule CV-5 on April 1st. As of this date, all counsel of record have consented to electronic service and are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV-5(a)(3)(A).

/s/ *Paul J. Hayes*
Paul J. Hayes